IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | CIVIL NO. MJG-11-0668 |
| v. | * | |
| | * | (False Claims Act Violations, |
| | * | 1 U.S.C. § 3729(a)(1) and (2)[1]; |
| JOHN ARTHUR KIELY, M.D., | * | Common Law Fraud; Unjust |
| | * | Enrichment; Payment by Mistake; |
| Defendant | * | Disgorgement |
| | * | |
| | * | |
| | * | |

*   *   *   *   *   *   *   *   *   *   *   *

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, the United States of America ("United States"), on behalf of its agency, the Department of Health and Human Services ("HHS"), and HHS's component, the Center for Medicare and Medicaid Services ("CMS"), brings this civil action against the defendant, John Arthur Kiely, M.D., to recover losses from false claims submitted to HHS as a result of the fraudulent course of conduct of the defendant (hereinafter "Kiely").

## INTRODUCTION

1.   Between October 29, 2002 and September 11, 2007, Kiely knowingly presented or caused to be presented false or fraudulent claims for payment to Medicare, Parts A and B, and Medicaid, for Argon Laser Trabeculoplasties ("ALT") that were either not actually performed or were performed and were not reasonable and necessary.

---

[1]   The False Claims Act was amended in 2009, and these amended provisions now appear at 31 U.S.C § 3729(a)(1)(A) and (B).

2.    Between December 10, 2002 and April 14, 2009, Kiely knowingly presented or caused to be presented false or fraudulent claims for payment to Medicare Part B for Lysis of Adhesion procedures ("LOA") that were either not actually performed or were performed and were not reasonable and necessary.

3.    Between November 12, 2002 and September 26, 2006, Kiely knowingly presented or caused to be presented false or fraudulent claims for payment to Medicare Parts A and B for Laser Peripheral Iridotomies ("LPI") that were either not actually performed or were performed and were not reasonable and necessary.

4.    All of the above-identified procedures are treatments designed to address certain conditions affecting the eye.   The fraudulent billing schemes committed by Kiely caused monetary losses to the Medicare Part A and B programs and Medicaid in an amount to be proven at trial.   The United States further alleges the following:

## <u>NATURE OF THE ACTION</u>

5.    This action is brought pursuant to the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729-33, to recover treble damages, civil penalties, and all available damages for common law fraud, unjust enrichment, payment under mistake of fact and disgorgement.

6.    This action is based upon the fact that Kiely knowingly presented or caused to be presented false or fraudulent claims to

the Medicare and Medicaid programs or knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims during the time-frames referenced in this Second Amended Complaint, resulting in payments by Medicare and Medicaid for services that either were not reasonable and necessary or were not rendered as represented.

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction over this statutory and common law action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367(a).

8.    Under 31 U.S.C. § 3732(a), the Court has personal jurisdiction over Kiely because he resides, has transacted business, and committed acts in this District in violation of 31 U.S.C. § 3729.

9.    Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because the acts committed by Kiely in violation of 31 U.S.C. § 3729 occurred in this District.

## THE PARTIES

10.   Plaintiff is the United States who brings this action on behalf of HHS and CMS, formerly known as the Health Care Financing Administration ("HCFA").

11.   At all times relevant to this Complaint, Kiely was a licensed physician engaged in the practice of ophthalmology in the

3

State of Maryland and performed laser surgery, saw patients, and otherwise did business at several locations, including 10 North Payson Street, Baltimore, Maryland 21223 (a clinic known variously as the Payson Street Clinic and Bon Secours Specialty Clinic and operated by Bon Secours Hospital).

12.   At all times relevant to this Complaint, Kiely treated patients covered by the Medicare Part A and B programs and Medicaid, which programs are described in more detail below.

<div align="center">

**THE FEDERAL HEALTHCARE PROGRAMS**

</div>

13.   The Medicare program provides medical insurance for covered services to any person 65 years or older, to persons with certain disabilities, and to individuals with end-stage renal disease who elect coverage under the program.

14.   Part A of the Medicare program authorizes payment for institutional care, including but not limited to services rendered by a hospital during inpatient and outpatient admissions.   Only Part A outpatient admissions are directly at issue in this case.

15.   Medicare Part B, also known as the Supplementary Medical Insurance Program for the Aged and Disabled, is a federally subsidized health insurance system for persons aged 65 or older and persons with qualifying disabilities.   Eligible persons obtain medical benefits in exchange for payments of monthly premiums.   The benefits covered by Medicare Part B include medical treatment and services performed by physicians.

<div align="center">

4

</div>

16.   HHS, as an agency of the United States, is responsible for the administration and supervision of the Medicare program. HHS has delegated the administration of the Medicare program to its component agency, CMS.   CMS, in turn, has delegated the administration of the Medicare program to Medicare Administrative Contractors ("MACs"), which administer, process, and pay Medicare claims based upon Medicare rules, regulations, and procedures.

17.   To obtain reimbursement from Medicare, providers such as hospitals or physicians must submit claims, that is, requests for payment, to the MAC.   Most health care providers submit claims electronically, though some providers continue to submit paper claims.

18.   When hospitals and physicians submit claims for treating patients, the claims contain code numbers representing the diagnoses for that patient.   These code numbers are referred to as "ICD-9" codes and originate from a book called the "International Classification of Diseases, 9th Edition."

19.   Providers also include on claims forms one or more multi-digit codes known as Current Procedural Terminology codes ("CPT codes").   The American Medical Association assigns and publishes these numeric codes and Health Care Financing Administration Common Procedure Coding System ("HCPCS") codes.   The codes represent hundreds of procedures and services performed by health care providers and so identify the services rendered and for which

reimbursement is sought.  Health care benefit programs, including Medicare and Medicaid, use CPT codes to determine whether to pay a claim and, if so, how much to pay.

20.  Medicare and Medicaid prohibit payment for services that are not actually rendered or are not "reasonable and necessary for the diagnosis or treatment of illness or injury."

21.  To obtain reimbursement pursuant to Medicare Part B, the physician seeking reimbursement must comply with applicable statutes, regulations, and guidelines.  A physician therefore has a duty to know the applicable conditions to obtain Medicare reimbursement.  Those regulations and guidelines include, but are not limited to:

a.  Billing Medicare for only reasonable and necessary services;

b.  Not making false statements or misrepresentations of material facts concerning requests for payment under Medicare;

c.  Providing evidence that the service provided is medically necessary;

d.  Assuring that such services are not substantially in excess of the needs of such patients; and

e.  Certifying, when presenting a claim for reimbursement, that the service provided is medically necessary.

22.  Any provider seeking Medicare reimbursement through Part B certifies on the claim form, in part, that "the services shown on

this form were medically indicated and necessary for the health of the patient and were performed personally by me . . ."

23.   The Medicaid program provides health care primarily for the poor and the disabled.   The United States shares the funding for the Medicaid program with the States, including the State of Maryland, and also ensures compliance with certain standards in administering the Medicaid program.   States, including Maryland, pay providers directly.

24.   By participating in the Medicaid program, providers agree to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.   Similar to the requirement for obtaining reimbursement through Medicare, Medicaid pays providers for services that are actually rendered, as represented on the claim form, and that are reasonable and necessary.

**THE FRAUDULENT CONDUCT COMMON TO ALL COUNTS**

25.   At all times relevant to this Complaint, Kiely was a provider of health care services to Medicare and Medicaid beneficiaries, having entered into provider agreements with HHS-CMS and the State of Maryland, respectively, to participate in each of those programs under the terms of those programs.   Kiely thus knew or should have known the conditions for reimbursement for medical services under both the Medicare and Medicaid programs.

26.   While participating as a provider in the Medicare and

7

Medicaid programs, on or about July 1, 2003, Kiely entered into an independent contractor agreement with Bon Secours Hospital to render ophthalmological services at its outpatient specialty health care clinic.  Under the terms of that agreement, Kiely agreed to comply with all applicable federal and State laws, regulations, and rules governing the services, and to cooperate with and assist Bon Secours Hospital  or its agents in the preparation of any and all financial, billing, and insurance records or reports.

27.  Kiely's false or fraudulent claims damaged the United States because the false claims resulted in the payment of federal monies that would not otherwise have been paid.  A number of different practices engaged in by Kiely contributed to his false and fraudulent billing of Medicare and Medicaid and caused the submission of false claims by Bon Secours Hospital, which billed the Medicare and Medicaid programs for the services it provided related to the procedures performed by Kiely.  Kiely's medical records generally lack clinical findings sufficient to justify as reasonable and necessary the laser procedures that he performed.

## Argon Laser Trabeculoplasties

28.  The optic nerve carries visual impulses from the eye to the brain, which processes the signals into a visual image. Glaucoma is a disease of the optic nerve characterized by optic nerve head and visual field damage.  The optic nerve damage is due, in part, to the intraocular pressure ("IOP").  With open angle

8

glaucoma, blockage or malfunction of the trabecular meshwork impedes the flow of fluid from the eye; the excess fluid backs up in the eye and may lead to eye pressure changes which can result in optic nerve damage. Lowering eye pressure slows or stops glaucoma from worsening in patients with both high and normal eye pressure. Without effective treatment, glaucoma can result in permanent vision loss.

29. Argon Laser Trabeculoplasty ("ALT") is a procedure used to treat open angle glaucoma and is identified for billing purposes by CPT Code 65855.

30. During ALT the laser beam is focused on the trabecular meshwork of the eye and a number of laser applications, or bursts, are placed over the meshwork.

31. ALT is intended to lower IOP by allowing fluid to drain through the normal pathways of the eye. Sustained control of IOP can prevent further damage to the optic nerve and loss of vision.

32. According to accepted medical standards, repeating ALT more than two times per eye, if 360 degrees of the trabecular meshwork has been previously treated, or performing the procedure on a patient who does not have open angle glaucoma is not reasonable and medically necessary under the professional medical standards applicable at all times relevant to this Complaint.

33. As an ophthalmologist treating glaucoma patients, Kiely knew or should have known the accepted medical standards regarding

the reasonableness and medical necessity of repeated ALTs.

34.   Patient medical records created by Kiely reveal the absence of a meaningful assessment of the optic nerve to determine the existence, degree, and progression of optic nerve damage, which is the best measure of glaucoma.   Elevated IOP or loss of visual field, standing alone, is not an indication to repeat ALT.

35.  Between 1999 and 2006, Kiely performed 14 ALTs on Patient M.B.[2]   Between April 8, 2003 and June 20, 2006, Patient M.B. received a total of eight ALTS, four to the right eye and four to the left eye.   For Patient M.B., Kiely thus presented and caused to be presented false claims to Medicare for 8 medically unnecessary ALTs, as follows[3]:

---

[2]   To protect the privacy of the patients referred to herein, each patient is identified by first and last initials.

[3]   The patient initials, dates of service, CPT codes, and amounts paid are included in Attachments ALT Part B, ALT Part A, and ALT Medicaid to this Second Amended Complaint to identify the false claims for ALTs billed and caused to be billed by Kiely during the time period relevant to this Second Amended Complaint.

| Date of Service Billed | CPT Code | Eye Treated | Paid Amount Payor: Medicare Part B | Paid Amount Payor: Medicare Part A |
|---|---|---|---|---|
| 4/8/03 | 65855 | RT(right) | $229.01 | $620.86 |
| 4/15/03 | 65855 | LT (left) | $229.01 | $641.77 |
| 6/1/04 | 65855 | RT(right) | $248.52 | $578.68 |
| 6/8/04 | 65855 | LT (left) | $248.52 | $578.68 |
| 2/15/05 | 65855 | RT(right) | $223.30 | $671.27 |
| 2/22/05 | 65855 | LT (left) | $223.30 | $626.85 |
| 6/13/06 | 65855 | RT(right) | $224.92 | $805.79 |
| 6/20/06 | 65855 | LT (left) | $224.92 | $745.18 |

36.   Moreover, Kiely used identical treatment parameters for each ALT treatment for nearly every patient, that is, 80 laser applications, or bursts, at a power of 800 milliwatts, .1 seconds, and 50 microns.  When performing ALT, varying the amount of laser energy used and the number of laser bursts to the trabecular meshwork to account for variations in the response of the tissue in the eye is expected.  Treatment should be tailored based upon how the patient's eye appears at the time, including the shape of the eye, the possible presence of other ocular abnormalities, and the eye's response during treatment.

37.   By way of example, Patient M.B., who received 8 ALTs between April 8, 2003 and June 20, 2006, received the exact same treatment parameters for each procedure, as follows:

| Date of Service Billed | CPT Code | Eye Treated | Laser Bursts | Laser Power |
|---|---|---|---|---|
| 4/8/03 | 65855 | RT(right) | 80 | 800 mw |
| 4/15/03 | 65855 | LT (left) | 80 | 800 mw |
| 6/1/04 | 65855 | RT(right) | 80 | 800 mw |
| 6/8/04 | 65855 | LT (left) | 80 | 800 mw |
| 2/15/05 | 65855 | RT(right) | 80 | 800 mw |
| 2/22/05 | 65855 | LT (left) | 80 | 800 mw |
| 6/13/06 | 65855 | RT(right) | 80 | 800 mw |
| 6/20/06 | 65855 | LT (left) | 80 | 800 mw |

38.    Similarly, Patient T.B. received 10 ALT procedures between April 8, 2003 and September 20, 2005.  Prior to April 8, 2003, Kiely had already performed 4 ALTs, two per eye, on Patient T.B.  As set forth below, the 10 ALTs performed within that period utilized the same treatment parameters as those used for Patient M.B.:

| Date of Service | CPT Code | Eye Treated | Laser Bursts | Laser Power |
|---|---|---|---|---|
| 4/8/03 | 65855 | RT (right) | 80 | 800 mw |
| 4/15/03 | 65855 | LT (left) | 80 | 800 mw |
| 1/20/04 | 65855 | RT (right) | 80 | 800 mw |
| 2/3/04 | 65855 | LT (left) | 80 | 800 mw |
| 7/27/04 | 65855 | RT (right) | 80 | 800 mw |
| 8/3/04 | 65855 | LT (left) | 80 | 800 mw |
| 2/22/05 | 65855 | RT (right) | 80 | 800 mw |
| 3/1/05 | 65855 | LT (left) | 80 | 800 mw |
| 9/13/05 | 65855 | RT (right) | 80 | 800 mw |
| 9/20/05 | 65855 | LT (left) | 80 | 800 mw |

12

39.   Despite repeated ALTs, according to Kiely's patient records, the patients identified in this Second Amended Complaint continued to have uncontrolled IOPs during the course of such treatment, indicating that the treatment was not reasonable and necessary because it was not effective.

40.   Patient M.H.-2 received 12 ALTs between March 25, 2003 and March 21, 2006.   Even after Kiely performed two ALTs on each eye, according to Kiely's records, M.H.-2's IOPs remained uncontrolled during the course of ALT treatment.   Yet Kiely billed or caused to be billed to Medicare 8 ALTs for Patient M.H.-2 as follows:

| Date of Service Billed | CPT Code | Eye Treated | Paid Amount Payor: Medicare Part B | Paid Amount Payor: Medicare Part A |
|---|---|---|---|---|
| 9/14/04 | 65855 | RT(right) | $248.52 | $755.02 |
| 9/21/04 | 65855 | LT (left) | $248.52 | $626.85 |
| 1/25/05 | 65855 | RT(right) | $223.30 | $595.18 |
| 2/1/05 | 65855 | LT (left) | $223.30 | $626.85 |
| 8/2/05 | 65855 | RT(right) | $223.30 | $753.91 |
| 8/23/05 | 65855 | LT (left) | $223.30 | $675.47 |
| 3/14/06 | 65855 | RT(right) | $224.92 | $660.82 |
| 3/21/06 | 65855 | LT (left) | $224.92 | $615.68 |

41.   Patient R.S. was treated by Kiely between August 1998 and April 26, 2005 and received approximately 18 ALTs in that period. Despite the number of ALTs Kiely performed, Patient R.S.'s IOPs were uncontrolled, and R.S. became blind from glaucoma in her right eye.   Had Patient R.S. been referred to a physician for surgery

known as a trabeculectomy when her initial ALT surgery failed to reduce her IOP, her vision in the right eye could have been preserved.  For Patient R.S., Kiely thus presented and caused to be presented false claims to Medicaid and Medicare for 6 ALTs that were not reasonable and necessary, as follows:

| Date of Service Billed | CPT Code | Eye Treated | Paid Amount Payor: Medicaid | Paid Amount Payor: Medicare Part A |
|---|---|---|---|---|
| 3/11/03 | 65855 | not noted | $270.00 | ---- |
| 3/18/03 | 65855 | not noted | $270.00 | ---- |
| 4/20/04 | 65855 | RT(right) | $0.00 | $727.05 |
| 4/27/04 | 65855 | LT (left) | $0.00 | $599.77 |
| 4/19/05 | 65855 | RT(right) | ---- | $637.01 |
| 4/26/05 | 65855 | LT (left) | ---- | $789.21 |

42.  Like the ALTs previously alleged, Attachments ALT Part B, ALT Part A, and ALT Medicaid to this Second Amended Complaint identify ALTs that were either not performed or, if performed, were not reasonable and necessary, and for which Kiely knowingly presented or caused to be presented false claims for payment to Medicare and Medicaid during the time period relevant herein.

43.  The Government reserves the right to further supplement this Second Amended Complaint with additional false claims submitted or caused to be submitted by Kiely for ALTs that were either not performed or were not reasonable and medically necessary and further reserves the right to demonstrate such through discovery and at trial.

## **Lysis of Adhesions**

44.   A cataract is a clouding of the lens of the eye that can impair vision.   During cataract surgery, the physician removes the cloudy lens that causes blurred vision from the lens capsule and inserts an artificial, or intraocular, lens to replace the natural lens.

45.   Lysis of Adhesion ("LOA") is a laser procedure to correct a rare complication of cataract surgery and is identified for billing purposes by CPT Code 65860.   The procedure is performed when the iris or vitreous becomes effectively stuck to the artificial, or intraocular lens inserted during a cataract removal procedure or to other structures in the eye. The LOA removes the adhesion and reshapes the iris.

46.   The LOA procedure is performed infrequently by ophthalmologists and if so, under accepted medical standards, is rarely performed more than once in an eye and only under specific circumstances when vision or the health of the eye is affected.

47.   As an ophthalmologist treating glaucoma patients, Kiely knew or should have known the accepted medical standards regarding the reasonableness and medical necessity of repeated LOAs.

48.   Medical records created by Kiely for patients who purportedly received LOAs lack clinical findings that the procedure was actually performed or, if performed, was reasonable and medically necessary.   Kiely's operative notes usually do not even identify what adhesions were purportedly being separated, or lysed.

49.    Between April 4, 2000 and July 13, 2004, Kiely performed or claimed to perform 6 LOAs on Patient D.J., three on the right eye and three on the left eye, and knowingly presented false claims for payment to Medicare Part B as follows:

| Date of Service Billed | CPT Code Billed | Eye Identified | Paid Amount: Medicare Part B |
|---|---|---|---|
| 7/6/2004 | 65860 | RT (right) | $213.76 |
| 7/13/2004 | 65860 | LT (left) | $213.76 |

50.    Between November 28, 2000 and December 17, 2002, Kiely performed or claimed to perform 8 LOAs on Patient I.H,  four on the right eye and four on the left eye, and knowingly presented false claims for payment to Medicare Part B as follows:

| Date of Service Billed | CPT Code Billed | Eye Identified | Paid Amount: Medicare Part B |
|---|---|---|---|
| 12/10/2002 | 65860 | RT (right) | $204.27 |
| 12/17/02 | 65860 | LT (left) | $204.27 |

51.    Like the LOAs previously alleged, Attachment LOA Part B[4] to this Second Amended Complaint identify LOAs that were either not performed or, if performed, were not reasonable and necessary, and for which Kiely knowingly presented false claims

---

[4]    The patient initials, dates of service, CPT codes, and amounts paid are included in Attachments LOA Part B to this Second Amended Complaint to identify the false claims for LOAs billed and caused to be billed by Kiely during the time period relevant to this Second Amended Complaint.

for payment to Medicare during the time period relevant herein.

52.   The Government reserves the right to further supplement this Second Amended Complaint with additional false claims submitted and caused to be submitted by Kiely for LOAs that were either not performed or were not reasonable and medically necessary and further reserves the right to demonstrate such through discovery and at trial.

## Laser Peripheral Iridotomies

53.   Laser peripheral iridotomy ("LPI") is the preferred procedure for treating narrow, or closed, angle glaucoma and is identified for billing purposes by CPT Code 66761.  There are two forms of narrow angle glaucoma, acute and chronic.  Acute narrow angle glaucoma occurs when the iris pushes up against the cornea, blocking the flow of fluid from the eye, resulting in substantially increased intraocular pressure.  However, the chronic form is more common and has no symptoms.  Both forms are treated with LPI, which uses a laser to create a small hole in the iris to allow the fluid to drain.  Under accepted medical standards, LPI is rarely performed more than once per eye.

54.   LPI is rarely necessary after a cataract is removed. Prior to removal, the cataract can push the crystalline, or natural, lens forward into the iris, which can then block the flow of fluid, causing narrow angle glaucoma.  When the cataract has been removed and the natural lens has been replaced with a much thinner plastic lens implant, angle closure is less likely to occur.

17

55.   As an ophthalmologist treating glaucoma patients, Kiely knew or should have known the accepted medical standards regarding the reasonableness and medical necessity of repeated LPIs.

56.   Medical records created by Kiely for patients who purportedly received LPIs lack clinical findings that the procedure was actually performed or, if performed, was reasonable and medically necessary.

57.   Kiely performed one or more LPIs bilaterally (both eyes) on many of the patients identified on ALT Part B, and on whom he also performed multiple ALTs bilaterally.   It is unusual for the same patient to experience open angle glaucoma and undergo ALT, much less repeated ALTs, and to also have narrow angle glaucoma and undergo LPI bilaterally.

58.   Between August 3, 1999 and May 31, 2005, Kiely performed or claimed to perform 12 LPIs on Patient B.D., six on the right eye and six on the left eye, and between LPI procedures, Kiely performed or claimed to perform 10 ALTs, five on the right eye and five on the left eye.   Kiely knowingly presented or caused to be presented false claims for payment to Medicare Parts A and B for LPIs as follows:

| Date of Service Billed | CPT Code | Eye Treated | Paid Amount Payor: Medicare Part B | Paid Amount Payor: Medicare Part A |
|---|---|---|---|---|
| 3/25/03 | 66761 | RT (right) | $248.18 | $663.60 |
| 4/1/03 | 66761 | LT (left) | $248.18 | $551.12 |
| 11/2/04 | 66761 | RT (right) | $260.26 | $800.31 |
| 11/9/04 | 66761 | LT (left) | $260.26 | $658.52 |
| 5/24/05 | 66761 | RT (right) | $269.18 | $810.46 |
| 5/31/05 | 66761 | LT (left) | $269.18 | $637.01 |

59.   In 1992, Kiely performed cataract surgery on Patient L.H.'s right and left eyes.  After performing cataract surgery, Kiely, between July 13, 1999 and December 28, 2004, performed or claimed to perform 6 LPIs on Patient L.H., three on the right eye and three on the left eye,  and between LPI procedures, Kiely performed or claimed to perform 20 ALTs, ten on the right eye and ten on the left eye. Kiely knowingly presented or caused to be presented false claims for payment to Medicare Parts A and B for LPIs as follows:

| Date of Service Billed | CPT Code | Eye Treated | Paid Amount Payor: Medicare Part B | Paid Amount Payor: Medicare Part A |
|---|---|---|---|---|
| 12/23/03 | 66761 | LT (left) | $248.18 | $670.66 |
| 1/6/04 | 66761 | RT (right) | $260.26 | $533.53 |
| 12/21/04 | 66761 | LT (left) | $260.26 | $686.27 |
| 12/28/04 | 66761 | RT (right) | $260.26 | $626.85 |

60.   In 2000, Kiely performed cataract surgery on Patient W.M.'s left eye, and in 2001 he performed cataract surgery on

Patient W.M.'s right eye.   After performing cataract surgery, between July 31, 2002 and May 5, 2004, Kiely performed or claimed to perform 4 LPIs on Patient W.M., two on the right eye and two on the left eye, and knowingly presented false claims for payment to Medicare Part B as follows:

| Date of Service Billed | CPT Code | Eye Treated | Paid Amount Payor: Medicare Part B |
|---|---|---|---|
| 3/24/04 | 66761 | RT (right) | $271.06 |
| 5/5/04 | 66761 | LT (left) | $301.18 |

61.   Like the LPIs previously alleged, Attachments[5] LPI Part B and LPI Part A to this Second Amended Complaint identify LPIs that were either not performed or, if performed, were not reasonable and necessary, and for which Kiely knowingly presented or caused to be presented false claims for payment to Medicare during the time period relevant herein.

62.   The Government reserves the right to further supplement this Second Amended Complaint with additional false claims submitted and caused to be submitted by Kiely for LPIs that were either not performed or were not reasonable and medically necessary and further reserves the right to demonstrate such through discovery and at trial.

---

[5]   The patient initials, dates of service, CPT codes, and amounts paid are included in Attachments LPI Part B and LPI Part A to this Second Amended Complaint to identify the false claims for LPIs billed and caused to be billed by Kiely during the time period relevant to this Complaint.

## COUNT ONE
## PRESENTING FALSE CLAIMS
### (False Claims Act, 31 U.S.C. § 3729(a)(1))

63.  The United States realleges and incorporates herein by reference paragraphs 1 through 62.

64.  With respect to the patients identified in this Second Amended Complaint and Attachments, the Defendant knowingly, that is, with actual knowledge of the falsity, or in deliberate ignorance or reckless disregard of the falsity, presented or caused to be presented false or fraudulent claims to the United States for payment or approval.  These false or fraudulent claims were presented or caused to be presented to Medicare Parts A and B and Medicaid for the payment of CPT codes 65855 ("Argon Laser Trabeculoplasty"), 65860 ("Lysis of Adhesion"), and 66761 ("Laser Peripheral Iridotomy").

65.  Each of the claims for payment submitted or caused to be submitted by the Defendant for each procedure identified in this Second Amended Complaint is a separate false or fraudulent claim.

66.  As described above in paragraphs 1 through 61, the claims identified in this Second Amended Complaint were false or fraudulent because they were claims for reimbursement for medical services that were not rendered as described in the claim for payment or not reasonable and necessary.

67.  As a result of the false or fraudulent claims knowingly presented or caused to be presented by the Defendant, the United States, through Medicare Parts A and B and Medicaid, paid the

claims and thereby sustained damages and the United States is entitled to statutory damages under the False Claims Act in an amount to be determined at trial, plus a civil penalty for each false claim.

### COUNT TWO
### MAKING OR USING A FALSE RECORD OR STATEMENT
### (False Claims Act, 31 U.S.C. § 3729(a)(2))

68.   The United States realleges and incorporates herein by reference paragraphs 1 through 62.

69.   With respect to the patients identified in this Second Amended Complaint and Attachments, the Defendant knowingly, that is, with actual knowledge of the falsity, or in deliberate ignorance or reckless disregard of the falsity, made, used, or caused to be made or used false records to get false or fraudulent claims paid by the United States through Medicare Parts A and B and Medicaid.

70.   The records the Defendant knowingly made or used or caused to be made or used for payment were false because they represented services that were not rendered as described or not reasonable and necessary as required to obtain payment.

71.   As a result of the false or fraudulent records made, used, or caused to be made or used by the Defendant, the United States, through Medicare Parts A and B and Medicaid, paid the claims and thereby sustained damages.  The United States is entitled to statutory damages under the False Claims Act in an amount to be determined at trial, plus a civil penalty for each

false claim.

## COUNT THREE
## COMMON LAW FRAUD

72.    The United States realleges and incorporates by reference paragraphs 1 through 71.

73.    The false or fraudulent claims identified in this Second Amended Complaint and Attachments that the Defendant submitted or caused to be submitted to Medicare Parts A and B and Medicaid constituted misrepresentations of material fact.

74.    The Defendant knew that his representations regarding the claims for payment submitted or caused to be submitted to Medicare Parts A and B and Medicaid were false, or he acted with reckless indifference to the truth.

75.    The Defendant knew that the United States would rely, and intended the United States to rely, upon these false representations.

76.    The United States reasonably relied upon the Defendant's misrepresentations and paid for the false or fraudulent claims submitted or caused to be submitted by the Defendant.

77.    As a result of the Defendant's false representations, the United States has been damaged in an amount to be determined at trial.

## COUNT FOUR
## UNJUST ENRICHMENT

78.    The United States incorporates by reference the allegations contained in paragraphs 1 through 77.

79.   The United States, through its agencies and contractors, directly and indirectly, paid the Defendant for false claims to Medicare Part B and Medicaid to which he was not entitled because the services were either not performed as represented or if performed were not reasonable and necessary.   In paying the claims that the Defendant submitted, the United States conferred a benefit on the Defendant.

80.   The Defendant knew or should have known that he was receiving reimbursements on the basis of false or fraudulent claims and in violation of the conditions for payment prescribed by the Medicare and Medicaid programs as described above.

81.   The Defendant's acceptance and retention of reimbursements based upon the false or fraudulent claims make it inequitable for him to retain the benefit or value of the reimbursements paid to him by the United States.

82.   By causing the United States to reimburse claims for falsely or fraudulently billed services to Medicare Part B and Medicaid, and by the receipt of those federal funds, Defendant has been unjustly enriched and is liable to pay the United States such amounts as will be determined at trial.

## COUNT FIVE
## PAYMENT BY MISTAKE

83.   The United States realleges and incorporates herein paragraphs 1 through 82.

84.   The false representations and records made by the Defendant concerning medical necessity of the services billed to

Medicare Part B and Medicaid and the actual performance of the services billed to those programs were material to the United States's determination to reimburse the Defendant for the services billed.

85.   The United States would not have paid for the claims relevant to this Second Amended Complaint and Attachments had it known that the medical services billed in the claims were not performed as described or not reasonable and medically necessary.

86.   The United States relied upon the Defendant's representations and concerning the actual performance and reasonableness and medical necessity of the medical services billed to Medicare Part B and Medicaid and paid the claims, thereby resulting in damages to the United States in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, the United States of America demands that judgment be entered in its favor and against the Defendant as follows:

A.   On Count One (Presenting False Claims), judgment against the Defendant for treble the amount of damages, as established at trial, plus a penalty of $5,500 to $11,000 per false claim as established at trial;

B.    On Count Two (Making or Using a False Record or Statement), judgment against the Defendant for treble the amount of damages, as established at trial, plus a penalty of $5,500 to

$11,000 per false claim as established at trial;

C.   On Count Three (Common Law Fraud), judgment against the Defendant for Plaintiff's damages as established at trial;

D.   On Count Four (Unjust Enrichment), judgment against the Defendant for Plaintiff's damages as established at trial, plus interest;

E.   On Count Five (Payment by Mistake), judgment against the Defendant for Plaintiff's damages as established at trial, plus interest;

F.   Disgorgement by the Defendant of all interest, earnings, and profits obtained fraudulently from Medicare and Medicaid between October 29, 2002 through April 14, 2009 and appropriate injunctive relief, including but not limited to remedies under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001, *et seq.*;

G.   In addition to the relief requested in paragraphs A through F, the Plaintiff requests that the Defendant be assessed pre-judgment interest from the date of the first false claim, as established at trial, and that Plaintiff be given any other relief that is deemed just, proper, and appropriate by the Court.

<div style="margin-left:40%">

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: ___/s/_____
Tarra DeShields
Roann Nichols
Assistant United States Attorneys
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201

</div>

(410) 209-4800
Counsel for the United States

**PRAYER FOR JURY TRIAL**

The United States of America requests a jury trial in this action.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: ___/s/_____

Tarra DeShields
Roann Nichols
Assistant United States Attorneys
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800
Counsel for the United States

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this _____ day of _____, 2013, a copy of the United States's Second Amended Complaint was filed electronically and served, by certified mail, on Steve Allen, Esquire, Hodes, Pessin & Katz, P.A., 901 Dulaney Valley Road, Suite 400, Towson, Maryland 21204.

  /s/ _____
TARRA DeSHIELDS
Assistant United States Attorney